Good morning, everybody. We are here for arguments today, September 15th, and I am at least keeping the red lights and the green lights on for Judge Flom. So we will begin with our first case of today, appeal number 19-1074, United States against Hector Aguirre and others. So I'm not sure whether Mr. Garcia or Mr. Mohamed would like to start. Thank you, Your Honor. May it please the court, I will begin. Mario Garcia, CJA counsel for Jose Manuel Carrillo-Tremillo. I'll be arguing two issues briefly this morning and discussing the joint issue of the denial of suppression of cell site location information, as well as the denial of Jose Manuel's motion for judgment of acquittal. Regarding the joint issue of suppression, we believe that this court should reexamine the Curtis opinion regarding the suppression of the cell site location information that was used in this case. What error in Curtis justifies revisiting that rather recent decision? When we look at the Curtis opinion, Your Honor, we do not believe that both Curtis and the district court in this case fully appreciated the sensitivity and the invasive privacy issues that were presented and discussed by the Supreme Court in Carpenter, which made the cell site location information akin to an ankle But can I suggest a slightly different perspective? Under the Stored Communication Act, the government didn't just go out and grab cell site data. They had to go through a warrant process. There was a certain amount of procedure. The government did so in this case. And then, of course, Carpenter comes along and says that's not enough. But what I'd like to hear from you is what additional protection do you think a warrant would give as opposed to the kind of subpoena that one got under the Stored Communication Act? I think the simple answer, Your Honor, is that a warrant would require the burden of showing probable cause, which coincidentally enough, right before trial, I think when the government sensed there might be some concern in introducing this evidence, they went out and, in fact, were able to obtain a warrant that had been issued upon a showing of probable cause, which is a higher standard than what the Storage Communication Act required the government to show to the court when it first sought the cell site location information. So I understand that. But on the facts of this case, looking at the evidence, and I actually would prefer not to rely on the government's last minute warrant. So I'm just going to put that to one side for the moment. But on the facts of this case, can't we look at that and assess whether this would have been probable cause? Because what we're trying to figure out under the Leon good faith exception is whether there's any further deterrent value to keeping this information out. And in Curtis, we said, if you've jumped through all the hoops of the Stored Communication Act, and the record is what it is, then the government didn't know at that time that it was operating in a system where that particular set of statutory procedures were not going to be enough. Yeah, and we think if you go back and you look at the fact that this information was so nearly exact in terms of surveillance that there should have been pause as to whether or not the government should have known it should get a warrant rather than merely try and comply with the SCA. It was this surveillance. But as Judge Wood is pointing out, at the time this information was gathered, law enforcement requested the record under a statute that uses a much looser standard than probable cause. It was later that the Supreme Court decided that a warrant under the Fourth Amendment applied. Correct. And we think that when we look at the Carpenter opinion, the Supreme Court was so concerned about the near-perfect surveillance that this cell site location information provided. Hundreds of points of location per day it could provide the government. Nearly, you could track the person's every move. That it wasn't objectively reasonable to conclude that they did not need a warrant to go out and track these individual defendants. So Mr. Garcia, are you going to address Mr. Carrillo-Tremillo's arguments with respect to the conspiracy to engage in money laundering? Because I'd be very interested to hear what you have to say about that. Yeah, thank you, Your Honor. If I can address both the money laundering and the conspiracy to distribute drugs, because I think they're similar, but I'll address the money laundering first. So the evidence here was very circumstantial in terms of whether or not Jose Manuel was a buyer or seller, or whether he was part of a conspiracy or had reached an agreement to not only engage in money laundering, but to engage in the distribution of trafficking and narcotics. And money laundering, obviously, is directly related to the government's position that it was to traffic or conspire to traffic narcotics. Right, and I assume that we are talking about the version of money laundering that is intended to promote the continuation of the unlawful activity. Because I see nothing in these arguments that is the design to conceal or disguise type. Yeah, I think that's what it has to be, Your Honor. But the evidence was so scant with respect to that money laundering and the connection to the crime, the evidence and the records in connection to the crime, that we don't believe there was sufficient basis for the case for that count, count four money laundering, to pass to the jury. So do you think that if you were not to prevail, suppose we thought that this evidence goes on the other part of the conspiracy, the distribution conspiracy. Suppose we thought that the evidence was enough to show more than buyer seller, that there was fronting and there was cooperation. There were all sorts of other things. Does that finding automatically mean that the government wins on money laundering too, or is there some distinction you see? No, I don't think it does. I think there is a distinction, because you're looking at the conspiracy through two different types of lenses. As you mentioned, on the conspiracy to traffic, we look at things like fronting or paying up front for the drugs. We look at warning others of police activity, concerted efforts to protect the conspiracy to keep moving the drugs. On the money laundering side, the only thing we have are some bank records and some testimony that there was cash present. We don't have anything else upon which the jury could reasonably find a basis for inferring that there was a conspiracy on the part of Jose Manuel and anyone else to launder that money. Well, why would it not have been sufficient to show that the other participants in the scheme repeatedly fronted drugs to him? I mean, can you distinguish the cases that characterize fronting as sufficient evidence to prove conspiracy rather than a simple buyer-seller relationship? Of course. So we would generally have in a conspiracy where we have two members of the conspiracy agreeing that one will deliver drugs to the other and then will receive payment at a later time after those drugs have been sold. There's a level of trust. Here, there's no specific evidence as to the timing of the payments and the delivery of drugs with respect to whether Jose Manuel had paid for these large amounts of drugs up front and then they were delivered to him, or whether Hector or the other co-conspirators had delivered it to him on credit and that they trusted him enough, which would be indicative of a conspiracy, to give him those drugs and then have him later pay. We see the transactions or inferences of those transactions, but we don't know specifically what those payments or the drugs in terms of timing were for. Mr. Garcia, what would you say to the evidence regarding the travel records? You know, the travel records are really inconclusive. While, of course, they, like the cell site information, show that Jose Manuel may have been in the same area as these co-conspirators. If he was merely a buyer-seller, it's natural that he would be in those same areas. The travel records don't establish the conspiracy here at all. In fact, I think it's an opposite, that whether they support the conspiracy or they support our view, that he was merely a buyer-seller. You are just about out of time, Mr. Garcia, so I think I'll ask you to stop here and we'll move to Mr. Mohabit. Thank you, Your Honor. Thank you. Good morning, Your Honor. May it please the court, my name is Amir Mohabit. I've been appointed to represent Defendant John Ramirez Prado on this appeal. And if it pleases the court, I would like to make two arguments. One is a joint argument that benefits all of the appellants concerning the district court erring by rejecting, denying the motion in Lemonet regarding homicide evidence and then subsequently not declaring a mistrial. That's the joint issue. And then also there is the individual issue for just my client regarding the unwarranted 3553A6 sentencing disparity. Regarding the joint issue, it is our position the district court abused its discretion. The homicide evidence that was admitted was not relevant as evidence to show that a conspiracy to move narcotics existed. The court cited to this court's opinions in LVR, Suggs, and Westbrook that the district court did reference that there's a risk pursuant to Suggs that there's a potential for abuse by admitting evidence of gang affiliation to substitute for evidence of conspiracy in a narcotic matter. But it is our position the district court did not heed its own warning. Is it your position then that the supplier was just flat not a part of this case? They weren't trying to use the Sinaloa cartel or Barrios Moreno for anything really. Or do you think the government did need to complete the story like why did you change from supplier number one to supplier number two? Well, your honor, I don't think the evidence necessarily ties these defendants to that particular cartel. Showing that they wanted, or that some of the appellants would have wanted people that are not connected to this case to have their life be spared and to be released from kidnap does not show that these appellants were doing business with the particular Sinaloa cartel. It's our position that when the district court gave the so-called limiting instruction to the jury, the court said, I'm gonna quote, the government will offer evidence pertaining to the kidnapping and murder of Angel Barrios Moreno, Adrian Barrios Moreno, and Luis Carlos Cebrero Alvarez in Mexico. No evidence exists to support the conclusion that any of the defendants on trial participated in the kidnapping and murder of these individuals. Had their names come up in any other context at the trial, those individuals who were kidnapped and murdered? Not that I'm aware of, your honor. So it was only this. They weren't otherwise relevant to the conspiracy or the money laundering or anything else. I believe that's accurate, your honor. And let me ask you this, please. Were there any indications from the jurors after the reassurance that the judge gave them that their personal information was secure? Were there any indications from the jurors after that reassurance that they remained fearful? Your honor, that's a great question. That takes us to the undue prejudice argument that I raised, or that should say the four defendants have raised. Once the parties had rested, on multiple occasions, jurors, including at least one time in writing, did inform the court of their concern. I cited this on page 16 of the appellant's brief. There were multiple communications where jurors were concerned about their personal information getting out there somehow. Right. That's the kind of undue prejudice. What I want to know, though, is was that, are you saying that that was after the reassurance that the judge gave? I can't speak to that, your honor. I don't know. The transcript, from my recollection, doesn't indicate the chronology on that matter. But even if the judge at the district court told the jurors, maybe even through some communication directly while the jury was deliberating, that their information is secure, we cannot just assume jurors thought, oh, well, my information's gonna be secure. The fact that they repeatedly indicated their concern demonstrates the undue prejudice. So the appellants did move for a mistrial, and that motion was denied. And on the life sentence for your client, we do have circuit precedent that holds there's no Eighth Amendment problem with that sentence for this crime. Are you aware of any court in any circuit holding that there's an Eighth Amendment concern with a life sentence on a continuing criminal enterprise charge? Your honor, my client did not receive a life sentence. He received a sentence of- Did he get 240 months, which was below? Correct. Wasn't that below the guidelines? It may have been below the guidelines, your honor. And the government's position is that if a sentence is below the guidelines, it's presumptively reasonable, but a presumption can be rebutted. Uh-oh, uh-oh, yeah. Of course a presumption can be rebutted, but he's down, his guideline range is 360 to life. He gets 240. And there's discretion. You know, the district court has explained why this seemed to be the appropriate sentence. It said it was considering the 3553A factors and so on. It might have been a bit of a breezy discussion, but this was a very serious arrangement. But your honor, getting back to how a presumption can be rebutted, I think it has been rebutted, both at the district court level and hopefully we can persuade this court. It seems that the district court created some sort of a prong within 3553 or 3553A6 specifically, where people that are similarly situated, one Mr. Samaniego, even worse situated, got lower sentences than Mr. Ramirez-Prado because Mrs. Samaniego cooperated against Mr. Ramirez-Prado. Cooperation against somebody else is not a prong under 3553A6. So Mrs. Yesenia Samaniego received a 60-month sentence largely because of her cooperation. That trickled down to help her husband, who has a more severe criminal history than my client. So he got a 230-month sentence and my client, because he exercises constitutional right to trial, got a 240-month sentence. It just doesn't seem to be a sufficient basis articulated. And when you read between the lines, I think it's apparent this impromptu new analysis was created, which created an unwarranted sentencing disparity. And cooperation, perhaps cooperation can help Mrs. Samaniego pursuant to 5K, but it shouldn't help her husband. He didn't cooperate. And it just seems that the court wanted to give that couple, Mr. and Mrs. Samaniego, additional leniency because they worked together in some capacity against Mr. Ramirez-Prado. And I don't think that's appropriate. The government concedes in its brief, the standard is not crystal clear as to how 3553A6 should be applied. But I don't think it's appropriate for a court to create its own factors to make that analysis. Well, if you'd like to save a little rebuttal time, this would probably be a good time to do it. Thank you. Sure. All right, so Mr. Wood has disappeared, but maybe he'll come back and we'll hear from him. I'm not here. Can anybody hear me? You're a black box on my computer, but. On mine. I can't see myself. Have you, did you turn the video off? I never turned it off. I don't know. Should I proceed? Your Honor, I apologize for that. I mean, we can hear you if you, do we know what's- There is also, you know, oh, it went away. I can try to start my video again. Why don't you start your video again? We'll just give it a minute. And if that doesn't work, then we'll proceed with just the audio. I have here that the host stopped my video. Oh. It says the host stopped my video. So they're- You must have done something very naughty. They're looking at it. So are you guys looking at what- I never miss an opportunity with this sort of panel. I apologize for that, Your Honor. Let's see if I can do it now. Can you still hear me? Do the rest. I can certainly hear you. I can hear you. I have this frozen image of myself that's very unflattering on my computer right now, I have to say. I look like I'm mid-sneeze. But- We'll proceed. And if we can pull the video up, that's fine. But we can, at least speaking for myself, I hope the other two judges also can hear you. Okay, Your Honor, maybe- Guys, forgive me. Does everyone else have a sort of screaming sound? I do. When Mr. Wood, yeah. No. Well, I can hear you over it. Well, we'll talk that up They're suggesting that, Mr. Wood, they're suggesting that you should leave and then try to come back in again and see if that works. I'll do it right now. Okay. Judge Wood? Yes. If I might also suggest, having done a few of these now, perhaps Mr. Amir and I will mute our cameras since we aren't arguing. Okay, that would be fine. Okay. Is he coming? I mean, he's completely gone now. Yeah, yeah. I can try to fix it. No, no. Poor guy, he's having a terrible time. Ah, there you are. Can everyone see me? Yes. There you are. All right, well, Your Honor, may it please the court, Judge Wood, on behalf of the government, if, with Your Honor's permission, I'd like to start by clarifying a few facts related to questions that the panel asks. First of all, and the statements that were made, first of all, both Samaniegos cooperated and testified. Jesus Samaniego received credit for testifying at trial against the cartel. And I think that was fair game for the comparison on Mr. Ramirez-Prado's point. As to Judge Rogner's question about the judge's reassurance to the jurors, my read of the transcript was that after that reassurance was happened about in the middle of the trial, about the 60% point, I don't recall any other comments from the jurors. And it's also relevant on this point, which, as I read the mistrial argument, it's sort of a piggyback of the relevancy argument. But on the specific mistrial point about the jurors' concerns, the district court, I think, was right to say that they raised their concerns only after defense counsel asked Yesenia Samaniego if she feared for her life because of the cartel and why she feared for her life. And she gave two or three answers, one or two answers saying these are very dangerous people. And so it really is a question. I'm sure if there was some concern, it's animated by the existence of the cartel within the confines of the case, the murder and kidnapping evidence, but also that questioning, I think it was fair for the district judge to chalk it up to that. But how exactly was that evidence relevant to proof of an element of any of the crime charge? I mean, given the obviously prejudicial nature of the, I really hope to hear something more than it provided, you know, the background. Well, sure. And let me just add that this is one of my primary concerns about this case as well. I am at a loss to see the relevance of the identity of one supplier versus another supplier. So even though something awful happened to Mr. Barrios Moreno, I don't see how it relates to this trial when the government just kind of waves its hand and says it's part of background. Then I really start looking for my wallet. Sure, Your Honor. I would start by saying that it is not correct that Mr. Barrios Moreno was not, that his identity was not a big part of the trial. The closing witness, perhaps the most powerful witness in the trial was Mr. Sobrero Alvarez, who talked about connecting up his friend Angel Barrios Moreno, who was always the cartel supplier from Mr. Castro Aguirre throughout the conspiracy. And that's why- But why is the identity of the supplier relevant to the conspiracy? I didn't see any sign that the government was trying to say that, say, Castro Aguirre and Carrillo Tramillo and so on were connected through Barrios Moreno. I don't see why his identity makes the slightest difference to your case. Because, Your Honor, the chief relevance from the government's point of view, I believe, is that he is the core connection, although several of the defendants were cartel members, he is their node to the cartel in Mexico. But you didn't need to prove that. You had all sorts of proof that they were conspiring with each other, and you didn't use him as a node. That wasn't the argument you were making. Maybe you see it that way now, but that's not, that wasn't the theory at trial. Well, the cartel overlay was a big part of the theory, and he was the connection to the cartel in Mexico. And also, I do think that it's important not to lose sight of the fact that a big part of the trial testimony was what these, was a series of relational connections between all the defendants and how this kidnapping and murder put that really to the front. When it happened, you immediately saw a connection between Mr. Castro Aguirre and Mr. Rojas Reyes in the sense that they felt the need to pay back the ransom. I really have a problem in under... Oops, we've lost Judge Rovner. I don't want to interrupt. Oh, there she is, yeah. Ilana, Judge Rovner, you should repeat your question. Yeah, I mean, I really have a problem here because why not just tell the jury that the drug store died? In other words, why was it necessary to tell them how he died? It's just so ridiculous. Sure, Your Honor. So there's this narrative between the kidnapping and the murder of all these connections. Castro Aguirre directs Ramirez Prado and some of the cooperators who had already testified to go across the country to collect these drug debts. And so the kid, if you say he just died, then you have to take the kidnapping out. So you take out that part of the story, right? So that whole narrative of that time period really has no explanation as to why they were going across the country to collect money for no drugs. Why? I mean, that's what they do all the time. I feel like I've seen a thousand drug conspiracies that operate that way. I mean, so one supplier drops out for some reason, maybe he's put in prison, maybe he dies, maybe he just decides to turn over a new leaf, you know, who knows? And they move on to another supplier. So there's this period, sure, Your Honor. I would just say there's this period of time where they spend almost all of their time resources collecting this money and going to Queens to pay someone for this ransom. And I suppose Your Honor would say if there are gaps in the timeline, the jury will attend to those. The government's view on this was to tell the whole story, the full intact timeline of all the, all the activities of the conspiracy and really- I don't see why it's a gap in the timeline. They're just collecting money that's owed to them from various members of the cartel. One assumes they do collect money from time to time. The use to which they wanted to put that money, which I want to get to, and the money laundering, because that's my other big issue, the conspiracy to launder the money, is another matter. But I just, when, it's one thing to say jurors are always concerned about their personal information. You know, if I were sitting in a traffic case, I probably wouldn't want my personal information out. But if you think it's the Sinaloa cartel who are gonna send representatives to your home, that's a whole different level. Sure, and at that point, then, we're talking about, I don't know if you're talking about, everybody knows, everybody fears the Sinaloa cartel because they are dangerous, presumably, so that, I'm understanding, Your Honor, to say that there shouldn't have been evidence of cartel membership as well, or are we just now- When you give graphic evidence that somebody has been kidnapped and murdered, the jurors might well think, boy, in this instance, if they find out who I am, is my life on the line? So it's a balance, right? I mean, in general, if this was an offshoot of the Sinaloa cartel, or part of it, or somehow associated with it, I wouldn't say that's all automatically irrelevant, but this is just such a tangent. Your Honor, I would just say that it showed, I still don't see it as a tangent. I understand your concerns about how prejudicial it is, but it showed Castro Aguirre's control over various people, it showed connections, it showed their drug debts. They were members of the cartel, not just sort of loosely related. They were the three of the defendants, not necessarily Mr. Ramirez Prado, but three of the defendants were members of the cartel, and their membership in the cartel was highly relevant conspiracy and continuing enterprise evidence. And this was, I would submit this is very relevant, highly specific conspiracy evidence about how all of these people were working together at a given time in relation to their association with the cartel. Which was- What is the government's best evidence that Carrillo Cremio was engaged in a conspiracy to commit money laundering? Obviously, there's plenty of evidence that he accepted drugs on credit and then paid for them. Where is the evidence of laundering the money or joining an agreement to launder money? It seems to me that at most the government cited evidence that he wanted to keep the drug conspiracy going, but what ties him to the actual money laundering? Well, he was in a conspiracy to commit money laundering- And could you start by defining what you think money laundering is when it's the branch of a financial transaction intended to promote the continuation of the unlawful activity? Is that just selling drugs or collecting money that was gotten by the street seller? The theory in this case is the financial transaction, it was taking the money that was owed to, when Mr. Carrillo Cremio took the money that was owed to Mr. Castro Aguirre and would pay those large sums of money for the purpose of promoting further drug deal. And- Why is that laundering as opposed- Why is that laundering as opposed to simply being in a conspiracy to distribute drugs? I mean, you use the same evidence to show that it's not simply buyer-seller, that there's this very complex set of financial interrelationships, and there was fronting, there was a lot of things that we look for under the Luchuga case and others, but I don't see what trans- Unless every case is gonna be double-charged, distribution and money laundering, I don't see what adds the money laundering. Your Honor, frankly, the existence of conceptual daylight there, I am sympathetic to the question in the sense that if the proof of the conspiracy is just fronting transactions, large fronting transactions, the aim of which is an ongoing conspiracy relationship, because that's the essence of the fronting evidence, and then the money laundering statute seems to cover, and I don't think there's a statutory interpretation argument that's been made by the other side here, but if the money laundering, if they were making such a challenge, and I think that's where Your Honor is going, if the money laundering promotion  through those actions of engaging in the conspiracy, then although I don't, of course, concede, the government doesn't concede that there is anything fatal in that charging, I do see your point about the substantial, almost eclipsing overlap between the way that the evidence would go towards those two charges. There are different things in the sense that- So I find that very troublesome, actually, and I've been racking my brain trying to think what might be financial transactions intended to promote the continuation of the unlawful activity, and I'm having trouble thinking of things that are beyond the distribution, whether it's maybe going out and buying a stash house to use or something, I mean, I don't know, but I feel as though, unless you're gonna double charge everything, you have described close to a 100, if not an exact 100% overlap between the distribution conspiracy and the money laundering conspiracy, and that's a problem. The only thing I would say there, Your Honor, is, and admitting that I'm at a lack for a hypothetical to respond to that, is that there were other transactions- So you don't know of any cases, I mean, cases looking at the continuation branch that would help you out of this bind? No, I do, I cannot, and I apologize that I don't have off the top of my head, I, in preparing for this, in writing the brief, I was under the impression from previous cases that at least this had gone unchallenged in the past, there wasn't the imprimatur from the court of this theory, but that this was something that I had seen in cases several times before, but in terms of on-point citation, this is one way that we approve doing this, and I was gonna add, though, in terms of a little bit of extra financial transaction evidence, there was evidence that Mr. Carrillo Trumillo went on the road to Whitestone, New York, rented hotel rooms to further engage in the trade, and that's, and to maintain the ongoing relationship with Mr. Castro Aguirre, that was not, as I see it, to be, you know, frank, the heart of the money laundering conspiracy evidence for him, it was, as Your Honor has correctly identified, the printing, but there were these separate transactions. Okay. And, unless there are other questions, I suppose I'll rest on my brief, but I would just remind the court that, in substantial part, the jury's concern seems to have been animated by defense counsel's questioning, although there are a lot of things at play here that this is a serious case involving serious people, so. Can I just ask one clarifying question? You had mentioned right at the outset when we were talking about the murder evidence that Yesenia had already said that she was perhaps afraid for her life if she were to be sent outside of the United States. Are you raising that by way of saying that the admission of this murder evidence was harmless error, if error, or are you, what's, where are you going with that point? Well, the point would be that, yeah, I suppose that's the argument. I'm trying to think of a way to articulate it as a matter of opening the door. It's not really an evidentiary issue in that sense, but my main point is the traceability of the juror's concerns directly to the cartel, although very naturally logical, is not necessarily borne out by the record in this case, given that she specifically, when elicited to testify as such by defense counsel, stated that these were dangerous people and that that came prior to the expression of concern by the jurors. Okay, if that's it, thank you very much. Mr. Garcia, you ran out of time, but I'll give you a minute if you have a little rebuttal. A brief rebuttal. Normally, Your Honor, I might hand a note to my co-counsel, but let me just provide these transcript citations because they're relevant to the court's questions. The photo of the murder came in at page 285. The limiting instruction was raised at page 613, and the juror's concern and safety came in at 1126. It did follow Ms. Samaniego's cross-examination in which she said, quote, "'There are dangerous people in Mexico.'" I just wanted to make those record notations for the court's ease. Your Honor, with regard to the money laundering, and you were asking Mr. Wood about the best evidence, and Judge Rovner indicated that there was evidence that Jose Manuel got drugs on credit and paid for them. But actually, I don't believe the government established the timing of the delivery of drugs and the payment of money with regard to one another. And what I mean by that is we don't know if when the government introduced evidence of the first delivery, if there had been a payment of money before that, or if the payment followed that delivery of drugs. We know there were delivery of drugs, we know there was money, but there's no evidence that Jose Manuel was buying on credit. Normally, we would have co-conspirator testimony who might say, yeah, he'd give it to me and he'd pay me back for it after he sold them. There was no evidence of that. Okay, I think you're gonna have to wrap it up here. And on that, I stand on a brief, thank you. All right, thank you. Mr. Mohabat, I think you had about a, what do you have, about a minute and some. Your Honor, I have nothing further to add, and I thank Mr. Garcia for giving the court those citations. All right, well, thanks to all counsel, and I believe that you were court appointed and we appreciate very much your service to your clients and the court, and we'll take this case under advisement.